**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

United States of America

v.

Robert G. Soucy, Jr.

1:23-cr-00081-SM-AJ

**DEFENDANT'S SENTENCING MEMORANDUM AND**
**MOTIONS FOR A DEPARTURE AND FOR A VARIANCE**

The Defendant, Dr. Robert G. Soucy, Jr., by and through counsel, hereby submits this Memorandum in support of his requests that the Court grant both a departure and a variance from the Sentencing Guidelines and sentence him to a term of probation for a period of two years.  This sentence is appropriate given his low risk of reoffending, his tremendous and unparalleled contributions to his community and the State, and his current physical and mental health conditions.

I.    Introduction

On September 13, 2023, Dr. Soucy was named in a 12-count indictment charging him with distribution of various controlled substances (fentanyl, hydromorphone, oxycodone, lorazepam, diazepam and methadone).  On December 18, 2024, Dr. Soucy was named in superseding 16-count indictment charging him with distribution of the same various controlled substances.  He pleaded guilty to Count 2 of that indictment on May 13, 2025. The remaining counts will be dismissed at sentencing.

II.    Guideline Calculations

The applicable guideline is found at U.S.S.G. §2D1.1.  Dr. Soucy calculates his Guideline Sentencing Range (GSR) by first determining his offense level.  As reflected in his objection

to the PSR, the defense position is that the only relevant conduct is contained in the first four counts in the indictment which refer to Patient 3.  The reasoning for this position will be explained in detail below.

If one counts only the four charged prescriptions to patient 3, the total amount of methadone distributed is 3,540 mg.  This converts to 1.77 kg of Controlled Drug Weight (CDW).  At that amount, the base offense level is 8.  Two points are added for the abuse of a position of public trust, pursuant to U.S.S.G. §3B1.3, bringing the adjusted Offense Level to 10.  At this level he receives a two-point reduction for acceptance of responsibility after application of U.S.S.G. §3E1.1(a), and another two point reduction as a Zero Point Offender (U.S.S.G. §4C1.1) so his total offense level is 6.  At Criminal History Category I, this yields a GSR of 0 – 6 months and is in Zone A of the sentencing table.

III.     Nature and Circumstances of the Offense

**Patient 3**

Dr. Soucy has no objection to the offense conduct as described in the plea agreement.  Specifically, he has pleaded guilty to count 2 and counts 1 – 4 should be treated as relevant conduct.  He did prescribe Patient 3 methadone for substance abuse disorder, and he was not authorized to do so.

Dr. Soucy was the family doctor for Patient 3 and his entire family.  He had known him from at least his early teens; he is now in his 40's.  Indeed, the Court will see in the "Letters of Support" (Exhibit 'D') a note of support from Patient 3's father, Clifton Boudle, Jr.  Although this is not offered as an excuse, this was a unique, and somewhat informal, family dynamic where they were long-time patients and Dr. Soucy trusted the information he was receiving.  Additionally, it should be noted that although Patient 3 states to law

enforcement that Dr. Soucy "did not appear to be keeping records" (PSR ¶46) this is belied by the extensive medical records for Patient 3 produced in discovery.

**<u>Patients 1 and 2</u>**

Turning now to the other conduct that the Government urges the Court to consider, Patients 1 and 2 should not be considered as relevant conduct. The Government has not established, even by a preponderance, that Dr. Soucy prescribed to these patients for no legitimate medical purpose and that he was not acting in the usual course of his professional practice. 21 C.F.R. §1306.04. The standard is set forth in *Ruan v. United States*, 597 U.S. 450, 142 S. Ct. 2370 (2022). There, the United States Supreme Court held that to obtain a criminal conviction, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner—i.e., not for a legitimate medical purpose acting in the usual course of his professional practice. *Id.* at 2382. An "objectively good faith effort" on the part of the doctor is not sufficient. *Id.* at 2381.

Both of these patients came to Dr. Soucy at existing high levels of prescriptions and were quite clearly addicted. He worked as best as he could, and in good faith, with both patients to get them in a better position. He had mixed results.

Patient 1 was in the military and would travel overseas on assignment during the time Dr. Soucy treated him. It is beyond dispute that when Dr. Soucy received him as a patient, he was already receiving high dosages of the controlled drugs. Previous treatment providers, primarily Dr. John Fothergill,[1] were responsible for prescribing at these levels.

---

[1] As noted in the PSR at footnote 3, Dr. Fothergill was identified by the Union Leader in 2013 as the largest prescriber of opioids in the State of New Hampshire. He eventually forfeited his license to prescribe

As the Court can see from the charts provided in Exhibit 'A', Dr. Soucy did not increase or escalate those dosages. Indeed, the prescriptions for hydromorphone decreased drastically as compared to Dr. Fothergill's practice. Those for fentanyl and diazepam remained steady.[2]

When Dr. Soucy inherited Patient 1 from Dr. Fothergill he was already receiving very high levels of opioids. As Dr. Soucy explained to the agents, he was a very difficult patient. Dr. Soucy worked to try to get his dosage reduced but was not successful. When the agents told him he would not be able to prescribe controlled drugs any longer, Dr. Soucy explained Patient 1's situation:

> It's leaving him high and dry [not being able to write prescriptions for him anymore], but he's also on an insane amount of medicines. He and his, his government's been giving it to him for 16 years. I'm talking about he gets, right now, he's on, John Fothergill got him up to some maxes but he, he's got patches, Fentanyl patches, about 100 mg that he gets every day. And that's his baseline. And he wants to have hydromorphone on hand for breakthrough or oxycodone on hand for breakthrough. So, he wants a supply of each. I'm not going to do that anymore.

Although it is true that Dr. Soucy did not conduct regular urine screens to ensure that Patient 1 was not diverting his drugs, he explained to the agents that he was confident based on conversations with neighbors and others ("Nobody comes to his house. He's an asshole. Nobody wants to deal with him.") that Patient 1 was not selling drugs. Dr. Soucy would also talk with Patient 1 on a regular basis to check on his status. He also had access to Dr. Fothergill's records, which showed that Patient 1 previously had acceptable results

---

controlled drugs. This led to Dr. Soucy "inheriting" several of his pain patients who were taking very high levels of opioids. Dr. Fothergill was never charged on either the state or federal level.

[2] Indeed, Exhibit 'A' documents that the prescriptions for diazepam **increased** considerably after Patient 1 was transferred to another doctor upon Dr. Soucy's arrest.

on his urine screens.  Finally, during the course of his treatment by Dr. Soucy, Patient 1 never suffered an overdose.

With respect to Patient 2, Dr. Soucy had better results.  As can be seen in Exhibit 'B', Dr. Soucy inherited Patient 2 from Dr. Fothergill who was prescribing very high amounts of fentanyl.  Dr. Soucy was in the process of gradually reducing the fentanyl amounts.  Patient 2 responded well.  Dr. Soucy's note from April 11, 2022 states "[Patient 2] is doing well with the 8 10mg tabs of methadone & he is stretching out the fentanyl patches now for about 3 days at a time & he needs refill of 75mg after that we will decrease the patches to 50mg & get them off here in the next 3 months so he's just on the methadone. **He doesn't feel useless anymore** … .  There's hope so I am refilling his 75mg Fentanyl patches." (emphasis added).  The charts in Exhibit 'B' confirm that Dr. Soucy is "stretching out" the fentanyl.  He prescribes in the same amounts, but less frequently than Dr. Fothergill.

Patient 2 confirmed that Dr. Soucy produced results.  He was interviewed by Agent Frank Borelli in May of 2023.  Borelli reported that:

> [Patient 2] was asked about the seemingly large amounts of controlled substances he is being prescribed by SOUCY. In response, [Patient 2] stated that he is actually on less controlled substances now due to SOUCY's care then (sic) when he was seeing Fothergill. He stated that SOUCY tried hard to get him off of the oxycodone and Oxycontin he was being prescribed by Fothergill. [Patient 2] stated he currently takes methadone, which is used not only for pain but to help him get off of the other opioids, minus the fentanyl patches which he is currently prescribed.  [Patient 2] reiterated that he is taking less now than he has ever in the recent past, and he still has issues moving around.

Patient 2 told Agent Borelli that he and Dr. Soucy's relationship was "strictly professional and that Dr. Soucy has "kept me going."   He stated further that he signed a

yearly contract with Dr. Soucy for his pain management treatment and that Dr. Soucy

charged him $40.00 per visit, which he paid by check.[3]

There is no indication in any of the discovery that Dr. Soucy was running a "pill mill",

that he was trading prescriptions for any type of favor or money, that his actions were

based on malice or that any of his treatment was motivated by anything other than a desire

to help people with their medical needs.

IV.     History and Characteristics of the Defendant

After calculating the GSR, the Court should weigh the factors set forth in 18 U.S.C.

§3553(a) before determining the sentence.  As the First Circuit explained in *United States v.*

*Martin*, 520 F.3d 87 (1st Cir 2008):

> This sequencing necessitates a case-by-case approach, the hallmark of which is
> flexibility. In the last analysis, a sentencing court should not consider itself
> constrained by the guidelines to the extent that there are sound, case-specific
> reasons for deviating from them. Nor should a sentencing court operate in the
> belief that substantial variances from the guidelines are always beyond the pale.
> Rather, the court should "consider every convicted person as an individual and
> every case as a unique study in the human failings that sometimes mitigate,
> sometimes magnify, the crime and the punishment to ensue." [*United States v*.]
> *Gall*, 128 S. Ct. 586 (2008) at 598.

 *Id.* 520 F.3d at 91.

Dr. Soucy's life history is a remarkable example of compassion, service and

dedication.

**Early Life and Education**

Dr. Soucy grew up in a small town in Maine as the oldest of seven children.  His

father was, at various times, a realtor, owner of a farm supply store, owner of a wholesale

---

[3] At the interview during the execution of the search warrant at his residence, Dr. Soucy explained that he operated on a "cash" basis because he did not want to manage the insurance paperwork.  He was operating as a sole practitioner and had no administrative assistance.

grocery warehouse, and owner of a family grocery store.  His mother was a homemaker.

After graduating from Holy Cross College, he began his life of service by joining the Jesuit

Volunteer Corps for a year.  Although he had plans to go directly to medical school after

that service, he deferred for a couple of years to help his father in one of his businesses.

Bob eventually did return to school. He earned a master's in microbiology and then

went to medical school.  After an internship and residency in Michigan, he settled in

Colebrook.  He has been living and working in that community ever since.

### Service to and Reputation in the Community

Dr. Soucy's commitment to his community is extraordinary.  The 32 letters of

support from the community, attached to this Memorandum as Exhibit 'C', provide example

after example of his compassion and selflessness.  Whether he was needed to sit and talk

with someone who was detoxing from alcohol, provide support for someone who was

suicidal, or to drive 30 miles on Christmas Eve to make a house call to a 98-year-old

woman, Dr. Soucy was answered the call.    As a Doctor of Osteopathic Medicine, Dr. Soucy's

focus was holistic, and patient centered.  This comes through with great clarity in the

letters of support.  The letters also document that Dr. Soucy stressed preventative medicine

and the value of supplements.  This is what he is known for in the North Country.   In

addition, he apparently routinely dispensed his services without ever asking for payment.

Dr. Soucy's letters of support from his family, attached as Exhibit 'D', demonstrate

that he has been a supportive brother, husband and father.  These letters, authored by the

people who know him best, confirm his good character.  As stated above, he interrupted his

education to help his father with the family business.  His sister, Diane Madden, saw this as

an example of selflessness and it made an impact on her.  His brother Stephen, who lived

7

with Bob in college, saw him as a trusted confidant and someone who "had [his] back."  His sister Denise, also a doctor, recounts how he encouraged her to pursue that profession when she was considering leaving college to help with the family business.  His daughter Erin and his wife Kay describe his stature in the community and his value as a father and husband.

Several of Dr. Soucy's colleagues have written letters of support which are contained in Exhibit 'C'.  Dr. Gary Sobelson (p. 8) describes Dr. Soucy's advocacy for the North Country Community before the New Hampshire Medical Society and the New Hampshire Academy of Family Physicians.  He describes Dr. Soucy as "a leader in applying public health principles to medical care delivery."  Similarly, Drs. Capobianco (p. 22), Moran (p. 41) and Kardell (p. 42) describe Dr. Soucy as a valued and trusted colleague.  Dr. Capobianco points out the difficulty of treating chronic pain in those patients addicted to opiates and that Dr. Soucy had the "courage and compassion to take on these difficult patients."  Dr. Moran makes the same point regarding Dr. Soucy's willingness to take on these patients when no one else would.  He also notes that Dr. Soucy's commitment and service to the people of the North Country has been exemplary.  Finally, Dr. Kardell respects Dr. Soucy so much that he entrusted the medical care of his own family to him.

**Anti-Smoking Advocacy**

Dr. Soucy was critically instrumental in getting the "Indoor Smoking Act" passed in New Hampshire.  *See* NH R.S.A. §155:64 – 78.  It was a long process which started in 2002 when Dr. Soucy drafted a proposed ordinance in Colebrook to eliminate smoking in restaurants. This ordinance passed in town meeting with his advocacy.  It was later overturned by the New Hampshire Supreme Court in 2003. *JTR Colebrook, Inc. v. Town of Colebrook,* 829 A.2d

1089 (N.H. 2003). This did not stop Dr. Soucy. Over the next several years he advocated at the state level to get the "Indoor Smoking Act" passed. This act has had a tremendous impact in making the State safer and healthier. As Dr. Sobelson notes, "[h]is impact in carving this legislative effort was truly central and meaningful."

**Medical Issues**

Finally, this Court should consider the medical issues that Dr. Soucy is enduring as a factor in sentencing. Because of the prior litigation on competency, the Court is familiar with Dr. Soucy's mild cognitive impairment, which is progressive in nature. In addition to that, Dr. Soucy recently underwent a corneal transplant and is recovering from that procedure. Unfortunately, he learned just this week that the tumor in his left kidney is cancerous. He will have additional consultations with his treatment provider in the near future to determine whether the kidney should be removed entirely or if it is possible to remove the tumor and preserve the kidney. Regarding his right kidney, he has a procedure scheduled in September to remove several very large kidney stones. He also has a tremor, hypertension, diabetes, incontinence and issues affecting his balance. He loses his balance frequently, leading to falls which cause injuries requiring medical care.

Dr. Soucy's wife Kay also has medical issues, and he is her care provider at home. She suffers from a "pontine cavernoma" in her brain which is prone to bleeding. Because of its location it is not operable. She is unable to drive and has mobility issues because of the condition. Dr. Soucy makes it possible for her to live in their home.

V.     Motions for a Variance and a Departure

If the Court does not adopt the GSR calculation urged by the defendant above, then it should grant both a variance and a departure.

The basis for a variance is set forth in Section IV, above.  The particular circumstances of Dr. Soucy's background establish that a variance is appropriate.  His history of service to the North Country is impressive.  It is unlikely that one could find another North Country doctor in the last several decades who has done more for people with medical issues than Dr. Soucy.  His advocacy regarding the banning of smoking is noteworthy in the context of granting a variance as well.  This important advocacy work and his service to this community are not taken into consideration at all in the Guidelines. Finally, he is needed at home to ensure that his wife is safe.  A variance is justified.

In addition, Dr. Soucy makes a motion for a departure pursuant to U.S.S.G. §5H1.4, which provides for a departure for a physical condition "if the condition … individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  Dr. Soucy's medical conditions are abundant as described above.  They are not static.  They are in the process of being evaluated and treated.  It is likely that he will need surgery in the coming months to address the tumor in his left kidney.  The cognitive impairment is progressive and will likely be exacerbated by prison conditions.  These medical conditions make him eligible for a §5H1.4 departure.  This is true for his own safety, as the likelihood of infection or other complications in the prison system is far higher than if Dr. Soucy remained in the community.  A departure under this provision is also warranted, as the guideline recognizes, because it would be "less costly" than imprisonment.

This court should grant Dr. Soucy's motions for a departure and a variance so that his Offense Level is reduced to the extent that his GSR is in Zone A of the Sentencing Table.  The court should then impose a sentence of two years of probation.

If sentenced to probation Dr. Soucy will still be punished for his actions.  His liberty will be conditional and enforced via supervision of the U.S. Probation Office.  His residence will need to be approved by probation.  He will be unable to travel, obtain employment, even volunteer work, without permission from his probation officer.  He will be required to submit to searches and drug screenings at their request.  He will have to abide by the rules of probation regarding curfews and his personal associations. If he violates these rules, he places himself at risk of being incarcerated at a BOP facility. Thus, while a sentence of probation will allow him to remain free from incarceration in a prison, it will not allow him to escape accountability for his actions. Given the restrictions on his liberty such a sentence would impose, it strikes the appropriate balance necessary for a sentence to be sufficient but not greater than necessary to accomplish the goals of sentencing.

The proposed sentence also reflects the seriousness of the offense.  It will act as both a general and specific deterrent.  A sentence of probation, with the threat of imprisonment in the event of a violation, is a just sentence, particularly considering Dr. Soucy's background and his remorse.  It will protect the public from the very unlikely event of further crimes committed by Dr. Soucy.    In short, this proposed sentence meets all of the criteria set forth in 18 U.S.C. § 3553(a).

VI.    Other Considerations

Congress requires this Cout to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)6.  Prosecutions of this type in Northern New England are rare. However, there was a recent case in the District of Maine that is worthy of discussion.  In the case of *United States v. Norris*, USDC Maine,2:22-cr-00132-NT, the defendant was a

doctor treating patients for pain management. The indictment and judgment are attached as Exhibit 'E'. She was convicted of 15 counts of distribution of a controlled drug. She was sentenced to three years of probation, 600 hours of community service, and a fine of $5,500.00. Some of the evidence against her was similar to the evidence against Dr. Soucy. However, according to the pleadings reviewed by counsel, there were several aggravating factors in her case which were not present in Dr. Soucy's case. For example, the Government alleged that Dr. Norris continued to prescribe to patients after they overdosed. Another patient was an employee of the defendant. She also took no action after receiving a phone call informing her that one of her patients was diverting his medication. Dr. Soucy's case contains none of these aggravating factors. Dr. Norris did not receive a sentence of incarceration. In order to avoid unwarranted disparities, this Court should sentence Dr. Soucy to probation as well.

Finally, should the Court issue a sentence of incarceration, Dr. Soucy requests that he be given a date to report to a BOP facility no earlier than January 1, 2027, and that the Court recommend to BOP that he be designated to a facility equipped to handle his complex medical issues. The basis for this request is that Dr. Soucy will have to coordinate with BOP and his doctors to make the transition as safe as possible. In addition, arrangements must be made to be sure that his wife has the services and care that she needs.

VII.    Requested Relief

The Defendant requests that the Court grant his motions for a departure and a variance and sentence him to a term of two years of probation. This sentence is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. *See* 18 U.S.C. § 3553(a). The Court should adopt his sentencing proposal

**WHEREFORE**, Robert G. Soucy, Jr., through counsel, requests that the Court sentence him as requested in this memorandum, and to such other terms as it deems just and proper.

> Respectfully submitted,
> ROBERT G. SOUCY, Jr.,
> By and through his counsel,
>
> */s/ John P. Newman*
> John P. Newman, Esq.
> NHBA No.:  8820
> Newman Law Office, PLLC
> 814 Elm Street, Suite 403
> Manchester, NH 03101
> (603) 935-5603
> john@newmanlawnh.com

## CERTIFICATE OF SERVICE

I, John P. Newman, hereby certify that a copy of the foregoing Memorandum has been forwarded via the ECF system on August 15, 2025, to counsel for the Government.

> */s/ John P. Newman*
> John P. Newman